**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| KENNETH LYONS, on behalf of himself and all others similarly situated, | : : : | Case No.: |
| | : | |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | **CLASS ACTION COMPLAINT FOR** |
| vs. | : | **VIOLATIONS OF FEDERAL** |
| | : | **SECURITIES LAWS** |
| BLUENRGY GROUP LIMITED, f/k/a CBD | : | |
| ENERGY LIMITED, RICHARD | : | JURY TRIAL DEMANDED |
| PILLINGER, TODD BARLOW, CARLO | : | |
| BOTTO, WILLIAM MORRO, and JAMES | : | |
| GREER | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

Plaintiff Kenneth Lyons, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by BlueNRGY Group Limited ("BlueNRGY" or the "Company"), and analyst and other media reports about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons or entities, other than Defendants, who purchase or otherwise acquired the common stock of BlueNRGY, f/k/a CBD Energy Limited (henceforth, "BlueNRGY" or the "Company") during the period from June 13, 2014 to October 24, 2014 (the "Class Period"), seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     BlueNRGY is an Australian corporation headquartered in Sydney, Australia.  The Company and its subsidiaries operate in the global renewal energy and energy-efficiency sectors, providing various renewal energy services and technologies.

3.     On June 13, 2014, BlueNRGY conducted a secondary offering in the United States, and sold 1,810,000 shares of the Company's common stock at $4.00 per share (the "June 2014 Offering").  BlueNRGY raised a total of $7,240,000 in the June 2014 Offering.

4.     The June 2014 Offering was conducted pursuant to a Registration Statement and Prospectus (the "Offering Documents") that BlueNRGY filed with the Securities and Exchange Commission ("SEC") and disseminated to the investing public.

5.     The Offering Documents, which included the Company's financial results dating back to 2012, failed to disclose numerous material related party transactions involving the Company's Managing Director and Chairman, Gerard McGowan ("McGowan").

6.     For example, the Offering Documents failed to disclose that a series of transactions that BlueNRGY entered into in 2012 and 2013 with Solon AG ("Solon") and Sligo Investments Limited ("Sligo") were actually related party transactions initiated by McGowan, and that McGowan controlled or had interest in both Solon and Sligo.

7.     As a result of the omissions, the Offering Documents were rendered false and misleading.  The Offering Documents::

- Overstated equity by AU $14,623,000 or 124.8% as of June 30, 2012 and by AU $10,710,000 or 843.3% as of June 30, 2013;

- Overstated total assets by AU $15,101,000 or 26.3% as of June 30, 2012 and by AU $10,307,000 or 23.9% as of June 30, 2013;

- Overstated revenue by AU $6,308,000 or 12.6% for the year ending June 30, 2012 and by AU $5,798,000 or 8.3% for the year ending June 30, 2013;

- Understated net loss by AU $14,623,000 or 36.4% for the year ending June 30, 2012.

8.     On October 23, 2014, after discussions with the Company's auditor, PricewaterhouseCoopers – Australia Firm ("PwC"), BlueNRGY's Audit Committee determined that there was sufficient uncertainty about the accuracy of related party disclosures involving McGowan, and therefore BlueNRGY's audited financial statements for the fiscal years ended June 30, 2012 (the "2012 Financial Statements") and June 30, 2013 (the "2013 Financial Statements") contained in the Offering Documents should no longer be relied upon.

9.     The following day, on October 24, 2014, the Company issued a press release admitting that BlueNRGY's previously issued 2012 Financial Statements, 2013 Financial Statements, and unaudited consolidated financial statements for the six month period ended December 31, 2013 (the "December Statements"), included in the Offering Documents, contained material errors, violated Generally Accepted Accounting Principles ("GAAP"), and must be restated.

10.     This announcement shocked the market and caused the price of BlueNRGY stock to drop $0.76 per share or over 37% to close at $1.25 per share on October 24, 2014.

11.     It is an unprecedented failure that a mere four months after the June 2014 Offering closed, BlueNRGY had to issue a notice of non-reliance and had to restate its financial statements which were included in the Offering Documents.

## JURISDICTION AND VENUE

12.     Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A.  PLAINTIFF

15.     Plaintiff Kenneth Lyons, as set forth in his accompanying certification, purchased BlueNRGY common stock during the Class Period and was economically damaged as a result of Defendants' violations of the securities laws. His PSLRA certification is attached hereto as **Exhibit 1.**

### B.  DEFENDANTS

16.     Defendant BlueNRGY Group Limited (Formerly known as CBD Energy Limited) (Australian Business Number 88-010-966-793), is an Australian corporation headquartered in Sydney, Australia. Founded in 1989, it purportedly provides clean, renewable, and cost-effective sources of electricity for consumers on three continents. On or around March 19, 2015, the Company's shareholders voted to rename the Company to BlueNRGY Group Limited ("BlueNRGY"). On March 20, 2015, CBD Energy Limited was officially renamed BlueNRGY Group Limited. For the purposes of this complaint, "BlueNRGY" refers to both CBD Energy Limited and BlueNRGY Group Limited. BlueNRGY common stock was traded on the NASDAQ under the symbol "CBDE." Trading of BlueNRGY stock was halted by NASDAQ on November 12, 2014. On July 22, 2015, NASDAQ filed a Form 25 with the SEC to delist BlueNRGY.  On September 9, 2015, BlueNRGY common stock resumed trading on the OTC Markets under the ticker "CBDEF."

17.     Defendant Richard Pillinger ("Pillinger") has been the Company's Chief Financial Officer ("CFO") since October 2011.  Prior to that, Pillinger served as the Company's Corporate Secretary.  Pillinger personally signed the Registration Statement for the June 2014 Offering. The Registration Statement also identifies Pillinger as the Company's Principal Financial and Accounting Officer.

18.     Defendant Todd Barlow ("Barlow") was a member of the Company's Board at all relevant times until he was replaced in August 2014. Barlow served on the Company's Audit Committee for the fiscal years ending June 30, 2013 and 2014. For the fiscal year ended June 2014, Barlow was designated as the "Audit Committee Financial Expert."  The Registration Statement touts Barlow as having "extensive experience in corporate finance, including...capital raising and stock exchange listings."  Barlow executed a power of attorney to allow McGowan to

sign the Registration Statement on his behalf.  On July 18, 2014, Defendant Barlow resigned as a director of the Company.

19.     Defendant Carlo Botto ("Botto") has been a member of the Company's Board at all relevant times and served on the Company's Audit Committee for the fiscal year ending June 30, 2013. On February 9, 2015, Botto was reappointed to the Audit Committee. Botto also serves as the Company's Senior Vice President of Strategy & Development.  Botto executed a power of attorney to allow McGowan to sign the Registration Statement on his behalf.

20.     Defendant William Morro ("Morro") has been a member of the Company's Board at all relevant times and served as the Chairman of the Audit Committee for the fiscal year ending June 30, 2014. Morro was designated as the "Audit Committee Financial Expert" for the fiscal year ended June 30, 2014.  On February 9, 2015, Morro was appointed as BlueNRGY's Managing Director. Morro personally signed the Registration Statement for the June 2014 Offering.

21.     Defendant James Greer ("Greer") was the Company's CEO of International Operations at all relevant times. In 2012, Greer was appointed Senior Vice President USA Development and relocated to the United States.  Greer executed a power of attorney that allowed McGowan to sign the Registration Statement on his behalf.  Greer was terminated in December 2014.

22.     Defendants Morro, Barlow, Botto, Pillinger, and Greer are referred to here, collectively, as the "Individual Defendants."

23.     BlueNRGY and the Individual Defendants are referred to collectively as "Defendants."

### C.  RELEVANT NONPARTY

24.     Gerard McGowan ("McGowan") was the Company's Managing Director and its Chairman of the Board of Directors ("Board") at all relevant times. McGowan took a 30-day leave of absence beginning on October 24, 2014. On November 14, 2014, McGowan was suspended as BlueNRGY's Managing Director and removed as a director of the Company. Effective on December 30, 2014, McGowan resigned as a director of BlueNRGY.1

25.     Pursuant to a power of attorney, McGowan signed the Registration Statement on behalf of Defendants Barlow, Botto, and Greer.

## DUTIES OF THE BOARD AND AUDIT COMMITTEE

26.     According to the Registration Statement, the Company's Board of Directors is responsible for, among other things, "ensur[ing] that an effective internal control framework exists within our Company and its subsidiaries.  This includes internal controls to limit the risk of fraud and ensure the integrity of our financial reporting."

27.     The Audit Committee is responsible for, among other things, "establishing and maintaining a framework of internal controls and ethical standards."  The Audit Committee also "provides [BlueNRGY's] Board with assurance regarding the reliability of financial information for inclusion in the financial reports."

## DEFENDANTS AND MCGOWAN'S VIOLATIONS OF THE SECURITIES LAWS

### *The Inaccurate Offering Documents*

28.     On June 4, 2014, BlueNRGY filed with the SEC its amended Registration Statement on Form F-1/A with the SEC.

29.     On June 12, 2014, the SEC declared the Registration Statement effective.

30.     BlueNRGY's common stock thus began trading on NASDAQ on June 13, 2014.

---

1 McGowan is not named as a defendant in this action because on May 27, 2016, McGowan filed a Suggestion of Bankruptcy with this court.  To Plaintiff's knowledge, McGowan's bankruptcy proceedings are still ongoing.

31.     The June 2014 Offering closed on June 18, 2014.

32.     In the June 2014 Offering, a total of 1,810,000 shares of BlueNRGY stock was sold at $4.00 per share. Total proceeds from the Offering were $7,240,000.

33.     The Offering Documents contained BlueNRGY's audited consolidated 2012 Financial Statements and 2013 Financial Statements, as well as BlueNRGY's unaudited consolidated December Statements.

34.     The Offering Documents had the effect of artificially inflating the value of BlueNRGY's common stock.

35.     On October 24, 2014, the Company issued a press release announcing that investors could no longer rely upon BlueNRGY's previously issued 2012 and 2013 Financial Statements and December Statements and that its financial statements must be restated.

36.     BlueNRGY's restatement of the 2012 Financial Statements and 2013 Financial Statements, included in the Offering Documents, was necessary to (i) address previously undisclosed related party transactions and (ii) correct material errors in the income statements for the years ending June 30, 2012 (the "2012 Income Statement") and June 30, 2013 (the "2013 Income Statement") and balance sheets as of June 30, 2012 (the "2012 Balance Sheet"), and June 30, 2013 (the "2013 Balance Sheet") included in the Offering Documents.

37.     The Offering Documents contained material errors relating to the Company's accounting treatment of related party transactions for the 2012 Financial Statements and 2013 Financial Statements. These financial statements were false and misleading because they failed to disclose material related party transactions involving McGowan which had an impact on the accuracy of the 2012 and 2013 Income Statements and 2012 and 2013 Balance Sheets.

38.     The Offering Documents were false and misleading because they failed to disclose material related party transactions involving McGowan, including:

- McGowan receiving reimbursements from the Company and its subsidiaries in the amounts of $121,900 and $134,100 that were outside the Company's customary approval process.

- In December 2013, BlueNRGY paying $676,000 to Solon, a past supplier to the Company and manufacturer of solar photovoltaic panels (technology that converts sunlight into electricity). The payment was solely initiated by McGowan and it cannot be verified that the payment was not for the personal benefit of McGowan.

- During the years ended June 30, 2012, 2013 and 2014, BlueNRGY entered into a series of transactions with Sligo in which McGowan was the sole intermediary. BlueNRGY issued Series 1 Convertible Notes to Sligo on two occasions which accrued interest and charges giving Sligo US $1,561,093 (AU $1,661,000) which were exchanged for 390,273 ordinary shares of BlueNRGY in June 2014. On the June 30, 2014 balance sheet, however, the balance for Series 1 Notes issued to Sligo was $0.

- In October 2013, Sligo loaned BlueNRGY $900,000 for working capital. A fee of $70,000 and interest of $6,410 was charged on the loan prior to repayment in December 2013. BlueNRGY's repayment of the loan was made to TRW Holdings Pty Limited, a private investment and advisory firm controlled by McGowan who is the principal shareholder.

39.     As a result of the above omissions, the Offering Documents were false and misleading as the 2012 and 2013 Financial Statements did not properly account for the related material party transactions, rendering the 2012 and 2013 Income Statements and 2012 and 2013 Balance Sheets inaccurate.

40.     The Offering Documents contained other material errors because the December Statements failed to properly record: (i) the full (or any) recoverable value in connection with a deposit of approximately $680,000 recorded as a current asset; (ii) approximately £575,000 of capitalized expenditures in connection with the Company's offering of Secured Energy Bonds; (iii) goodwill and impairment; and (iv) certain expenses.

41.     As detailed further below, the 2012 and 2013 Financial Statements included in the Offering Documents were false because they, *inter alia*:

- Overstated equity by AU $14,623,000 or 124.8% as of June 30, 2012 and by AU $10,710,000 or 843.3% as of June 30, 2013;

- Overstated total assets by AU $15,101,000 or 26.3% as of June 30, 2012 and by AU $10,307,000 or 23.9% as of June 30, 2013.

- Overstated revenue by AU $6,308,000 or 12.6% for the year ending June 30, 2012 and by AU $5,798,000 or 8.3% for the year ending June 30, 2013;

- Overstated goodwill and other intangible assets by AU $11,232,000 or 49.3% as of June 30, 2012 and by AU $8,232,000 or 51.8% as of June 30, 2013; and

- Understated net loss by AU $14,623,000 or 36.4% for the year ending June 30, 2012.

### ***The Offering Documents Were Not Prepared In Accordance With GAAP***

42.     GAAP constitutes standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

43.     GAAP is the common set of accounting principles, standards, and procedures that public companies trading in the United States use to compile their financial statements.

44.     The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). A Statement of Financial Accounting Standards ("SFAS") is a formal document issued by the FASB which details accounting standards and guidance of the FASB's accounting policies. A SFAS is issued with the expectation that companies listed on a stock exchange in the United States will adhere to it.

45.     Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

46.     The Offering Documents falsely stated that BlueNRGY's financial statements were audited in accordance with Public Company Accounting Oversight Board ("PCAOB")

standards. Financial statements which conform to PCAOB standards are also in accordance with GAAP. AU 410.

47.     SEC and NASDAQ rules and regulations require that financial statements included in a registration statement or prospectus must comply with GAAP. *See* Regulation S-X.

48.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

49.     Under GAAP "restatements" are required for material accounting errors that existed at the time financial statements were prepared. *See* SFAS 154; FASB Accounting Standards Codification ("ASC") 250.

50.     An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP. SFAS 154; ASC 250.

51.     Errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared.  SFAS 154, ASC 250.

52.     BlueNRGY's restatements were caused primarily by the misuse of facts and the failure to apply properly its accounting policies that complied with GAAP.

53.     A restatement is a *prima facie* showing that the financial statements were false.

54.     The need to restate BlueNRGY's 2012 and 2013 Financial Statements is an admission that the 2012 and 2013 Financial Statements did not comply with GAAP and were therefore materially false and misleading.

### *GAAP Requires Defendants To Disclose Related Party Transactions*

55.     GAAP, SFAS, and SEC Regulation S-K ("Reg. S-K") mandate the disclosure of all material related party transactions.

56.     SFAS No. 57 and ASC No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; ASC 850-10-50-1.

57.     "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; ASC 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); ASC 850-10-20.

58.     Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; ASC 850-10-50-1.

59.     In its Form 6-K filed with the SEC on October 24, 2014, BlueNRGY admitted that the Company had to restate its 2012 and 2013 Financial Statements and the December Statements because the Company failed to disclose related party transactions in the Offering Documents and during the Class Period. The failure to disclose the related party transactions was a violation of GAAP and PCAOB standards.

60.     Restatements are required for material accounting errors that existed at the time financial statements were prepared. *See* SFAS 154.

61.     The failure to disclose the related party transactions herein was a misuse of facts that were actually known – or should have been known – to Defendants at the time they signed and filed BlueNRGY's Offering Documents the SEC.

62.     Reg. S-K (together with the General Rules and Regulations under the Securities Act of 1933 ["Securities Act"] and the forms under the Securities Act) states the requirements applicable to the content a registration statement. (*See*, Reg. S-K, §229.10).

63.     Reg. S-K at Section 229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

64.     Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

65.     Reg. S-K Section 229.303, Item 404 (b)(1)(6) also mandates disclosure of any other relationships that the registrant is aware of between the nominee or director and the registrant that are substantially similar in nature and scope to those relationships listed in paragraphs (b)(1) through (5).

66.     A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director

or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

67.     BlueNRGY's 2012 and 2013 Financial Statements were prepared in accordance with International Financial Reporting Standards ("IFRS").

68.     IFRS, as issued by the International Accounting Standards Board ("IASB"), are substantially the same as GAAP as they both require disclosure of related party transactions.

69.     International Accounting Standard ("IAS") 24 requires disclosure in the financial statements of related party transactions. The definition of related parties is materially the same as that found in SFAS 57.

## THE RESTATEMENT

### *The Undisclosed Related Party Transactions*

70.     BlueNRGY's Offering Documents failed to disclose material related party transactions involving McGowan.

71.     According to BlueNRGY's Form 20-F for the year ending June 30, 2014, filed with the SEC on June 1, 2015, (the "2014 20-F"), BlueNRGY admitted that it failed to disclose and should have disclosed related party transactions involving McGowan. Subsequently, on July 10, 2015, BlueNRGY filed a Form 20-F/A with the SEC (the "2014 20-F/A"). All references to the 2014 20-F mean both the 2014 20-F and the 2014 20-F/A.

72.     The 2014 20-F stated in relevant part:

> *Between July 1, 2014 and his suspension on October 24, 2014, a series of payments were made to a Director, Mr. McGowan from the Company and its subsidiaries totalling $121,900 outside of the Company's customary approval processes and were purported by Mr. McGowan to be for reimbursement of costs incurred on behalf of the company paid by himself.* The Company has not been provided with adequate documentation by Mr. McGowan to determine whether or not these costs

represent bona fide costs incurred on behalf of the Company. These payments have been recognised as an expense in our fiscal year 2015.

*     *     *

*A series of payments were made to Mr. McGowan from the Company and its subsidiaries totaling $134,100 outside of the Company's customary approval processes and were purported by Mr. McGowan to be for reimbursement of costs incurred on behalf of the company paid by him*. The Company has not been provided with adequate documentation by Mr. McGowan to determine whether or not these costs represent bona fide costs incurred on behalf of the Company. These payments have been recognised as an expense in profit or loss for the year ended June 30, 2014.

(Emphasis added).

73.    The 2014 20-F also discussed related party transaction between BlueNRGY and Solon, stating in relevant part:

*An amount of $676,000 was paid to Solon AG in December 2013 which was solely initiated by a Director, Mr Gerry McGowan (no longer a director) outside of the customary approval processes of the Company. Mr McGowan represented to the Company that the payment was a deposit for a future order of Solar PV panels from Solon, however the Company has been unable to confirm that such an order was placed or accepted*. Despite attempts to independently verify the nature of this transaction and the validity of the supporting documentation, the Company has been unable to do so and cannot be assured that it was not made for the personal benefit of Mr McGowan. *A payment was received by the Company in October 2014 for $680,000 from a third party. Documentation was provided to the Company in relation to this transaction which stated that this payment was consideration for the assignment of the alleged deposit by Solon to the party remitting the payment.* In absence of definitive information to the contrary the amount of $676,000 is recorded within Other Assets in the Statement of Financial Position at June 30, 2014. The funds received in October 2014 will be credited against Other Assets unless additional information is obtained by the Company to contradict this accounting treatment.

(Emphasis added).

74.    The 2014 20-F details related party transactions between BlueNRGY and Sligo, stating in relevant part:

(f) Transactions with Sligo Investments Limited

> ***During the years ended June 30, 2014, 2013 and 2012 the Company entered into a series of transactions with Sligo Investments Limited. These transactions were all conducted with Mr McGowan acting as the sole intermediary between the Company and Sligo. The Company and its Board of Directors have been unable to determine the identity of the parties who either own or control Sligo and have also been unable to determine the incorporation status of Sligo. Despite attempts to determine the facts surrounding Sligo, the Company cannot be assured that it is not a related entity to Mr McGowan.***

> During the year ended June 30, 2012 the Company issued Series 1 Convertible Notes with a face value of US$1,000,000 to Sligo. On subscription to the Series 1 Convertible Notes 15,723 warrants were issued to Sligo with an exercise price of US$15.90($16.92) and an expiry date of May 31, 2017. A further 24,245 warrants with an exercise price of US$15.90($16.92) and an expiry date of May 31, 2017 were issued to Sligo during the 2013 financial year following an amendment to the Series 1 Convertible Notes. Interest and fees were incurred on these notes in the year ended June 30, 2014 of US$235,005($250,000) (2013: US$348,676($371,000); 2012: $Nil). These charges were incurred on the same terms as for all Series 1 Noteholders. In June 2014 the Series 1 Notes held by Sligo and all accrued interest and charges totalling US$1,561,093($1,661,000) were exchanged for 390,273 ordinary shares in the Company. At June 30, 2014 the balance on the Series 1 notes issued to Sligo was $Nil.

> ***In October 2013, Sligo loaned the Company $900,000 for working capital purposes under a loan agreement between Sligo and the Company. An arrangement fee of $70,000 and interest of $6,410 was charged on the loan prior to its repayment in December 2013. Under the sole direction of Mr McGowan, the repayment was made to TRW Pty Limited in satisfaction of this loan, as confirmed by documentation received from Sligo subsequent to the repayment.***

(Emphasis added).

75.    The 2014 20-F states that PwC notified BlueNRGY that there were material weaknesses in the Company's financial controls, as the 2014 20-F states in relevant part:

> Notice of material control weaknesses and investigation of possible contraventions of the Corporations Act

The Audit Committee received notices from PwC that PwC has identified material weaknesses in financial controls and had identified the possibility of misconduct and contraventions of the Australian Corporations Act 2001 (Cth) (the 'Act') by the Company and involving the Company's Executive Chairman and Managing Director, Mr. McGowan.

### *Restated Balance Sheets and Income Statements*

76.     On October 24, 2014, the Company issued a press release announcing the non-reliance of and restatement of its previously issued 2012 and 2013 Financial Statements and December Statements, which states in relevant parts:

CBD Energy Limited (CBDE) ("CBD") announced today in a filing with the SEC on Form 6-K that the Company, through its Audit Committee, and in concert with PricewaterhouseCoopers, its independent registered public accounting firm, has determined that *its audited Financial Statements for the 2012 and 2013 Fiscal Years, and its unaudited interim financial statements as of and for the six months ended December 31, 2013 (the "December Statements") cannot be relied upon, and revisions are required.*

*In the case of the audited financial statements for Fiscal Years 2012 and 2013, the determination of non-reliance is related solely to uncertainty about the completeness and accuracy of disclosures with respect to related party transactions.* It is anticipated that revisions will impact footnotes to the financial statements, and that no material revisions will be required to be made to the Statements of Operations or Balance Sheets related to those periods.

*With respect to the December Statements, in addition to uncertainty about disclosures of related party transactions, there are also uncertainties as to whether:*

*-    the full (or any) value is recoverable in connection with a deposit of approximately $680,000 recorded as a current asset;*

*-    some or all of approximately £575,000 of expenditures capitalized in connection with the Company's offering of Secured Energy Bonds should have been expensed under the highly technical requirements of AASB139 Financial Instruments: Recognition and Measurement ;*

*-   disclosures regarding goodwill were adequate and some impairment should have been recognized;*

*-  certain expenses should have been classified in different categories.*

The Company's Audit Committee is conducting a review of the foregoing issues and the Company is not currently aware of any other accounting errors requiring adjustment to any prior period Financial Statements; however, the possibility remains that adjustments or supplementary disclosures will be required in addition to those noted. As a consequence of the review, the Company expects a delay in completing its audit of 2014 Fiscal Year Financial Statements and to file its annual report on Form 20-F after the regulatory deadline. Nevertheless, the Company intends to do so as soon as practicable.

***Mr. Gerard McGowan, the Company's Executive Chairman and Managing Director, is the potentially related party referenced above, and he proposed to take a voluntary leave for 30 days.*** This action was unanimously approved by the Board to avoid any doubt that the Audit Committee could conduct its review in the most expeditious and independent manner. Mr. William Morro, Chairman of the Company's Audit Committee, has also been appointed as non-executive Chairman of CBD. On an interim basis, the Executive Committee of the Board, also chaired by Mr. Morro, is providing executive guidance and ensuring continuity of decision-making.

Mr. Morro stated, "It is constructive that Gerry has chosen to recuse himself from the business during the Audit Committee review and committed to cooperate fully to facilitate a quick and definitive conclusion to the Audit Committee's assessment and as rapid a completion of the Fiscal Year 2014 audit as possible. In addition, Gerry will be available to the Board and management during his leave to ensure that the ongoing operations of the Company are not disrupted. The Board is confident that CBD's capable business unit managers on three continents will continue to carry out the Company's strategies and execute on its business plans with minimal disruption during Gerry's leave. These plans include the ramp-up of residential solar sales in the US, which was kicked off last week with the completion of the first Westinghouse Solar US installation and that business unit's initial recognition of revenue."

(Emphasis added).

77.     On that same day, the Company filed a Form 6-K with the SEC expounding on the non-reliance of its previously issued 2012 and 2013 Financial Statements and December Statements, which states in relevant parts:

**Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

***On October 23, 2014, the Audit Committee, after discussions with PricewaterhouseCoopers ("PwC"), the Company's independent registered public accounting firm, determined that there was sufficient uncertainty about***

*the accuracy of disclosures about related-party transactions involving its Executive Chairman and Managing Director, Mr. McGowan, that its previously issued audited financial statements for the fiscal years ended June 30, 2013 and 2012 should no longer be relied upon.* The Audit Committee is exploring the uncertainties and, if required, the Company will file restated audited financial statements for its 2012 and 2013 fiscal years as soon as practicable. The Company is not currently aware of any accounting errors requiring adjustment to any prior period audited financial statements, however, there can be no assurances that the Company or PwC will not find accounting errors requiring adjustments or amended disclosures applicable to those or earlier periods.

*On October 23, 2014, the Audit Committee determined that the interim financial statements as of and for the six months ended December 31, 2013 should no longer be relied on because of uncertainty about:*

- *the accuracy of disclosures about related-party transactions occurring during the period and involving Mr. McGowan;*

- *whether there is an expectation of the Company realizing full value or any value from a payment made in December of approximately $680,000 that was recorded as a deposit during the period and included in current assets and, if an impairment is warranted, when that impairment should have been applied;*

- *the adequacy of disclosures regarding goodwill and the possibility that an impairment of goodwill might be appropriate;*

- *whether the capitalization of certain payments related to the costs of issuing retail bonds in the United Kingdom, currently believed by the Company to be, in the aggregate, up to approximately £575,000, was appropriate giving effect to the specific requirements of AASB139 Financial Instruments: Recognition and Measurement and, if not, whether some or all of the amount capitalized should be recognized as an expense during the period;*

- *whether some of the expenses recorded during the period should be classified in different categories; and*

- *whether other provisions and additional expenses that could be material may need to be recognized in the period that cannot be estimated at this time.*

The Audit Committee is exploring the uncertainties affecting the financial statements as of and for the six months ended December 31, 2013 and, if warranted, the Company will disclose adjustments thereto as soon as practicable.

(Emphasis added).

78.     The 2014 20-F included the restated financial statements for the fiscal years ending June 30, 2012 and 2013. For the purposes of this Complaint, the "reported" figures are the numbers found in the Offering Documents. The "restated" figures are the updated numbers included in the 2014 20-F.

79.     The reported and restated balance sheet as of June 30, 2012 (the "Restated 2012 Balance Sheet"), with the percentage either overstated or understated, is attached hereto as **Exhibit 2**.

80.     The Restated 2012 Balance Sheet demonstrates that the 2012 Balance Sheet was false and misleading as it either overstated or understated line items by material amounts, including:

- Inventories which were overstated by AU $4,078,000 or 21.8% in the Offering Documents;

- Other Current Assets which were overstated by AU $1,040,000 or 82.6% in the Offering Documents;

- Goodwill and other intangible assets which were overstated by AU $11,232,000 or 49.3% in the Offering Documents; and

- Total equity which was overstated by AU $14,623,000 or 124.8% in the Offering Documents.

81.     BlueNRGY's income statement for the year ended June 30, 2012 with the reported and restated figures (the "Restated 2012 Income Statement") is attached hereto as **Exhibit 3**.

82.     The Restated 2012 Income Statement demonstrates that the 2012 Income Statement was false and misleading as it either overstated or understated line items by material amounts, including:

- Revenues from continuing operations which were overstated by AU $6,308,000 or 12.6% in the Offering Documents;

- Impairment of intangible assets was overstated by AU $10,891,000 or 1,693% in the Offering Documents;

- Loss from continuing operations before income taxes was overstated by AU $13,157,000 or 35.3% in the Offering Documents; and

- Net loss for the period was understated by AU $14,623,000 or by 36.4% in the Offering Documents.

83.     The reported and restated balance sheet as of June 30, 2013 (the "Restated 2013 Balance Sheet"), with the percentage difference between the reported and restated figures, is attached hereto as **Exhibit 4**.

84.     The Restated 2013 Balance Sheet demonstrates that the 2013 Balance Sheet was false and misleading as it either overstated or understated line items by material amounts, including:

- Inventories which were overstated by AU $1,416,000 or 87.9% in the Offering Documents;

- Other Current Assets which were overstated by AU $80,000 or 17.3% in the Offering Documents;

- Goodwill and other intangible assets which were overstated by AU $8,232,000 or 51.8% in the Offering Documents; and

22

- Total Equity which was overstated by AU $10,710,000 or 843.3% in the Offering Documents.

85.     BlueNRGY's income statement for the year ended June 30, 2013 with the reported and restated figures (the "Restated 2013 Income Statement") is attached hereto as **Exhibit 5**.

86.     The Restated 2013 Income Statement demonstrates that the 2013 Income Statement was false and misleading as it either overstated or understated line items by material amounts, including:

- Revenues from continuing operations which were overstated by AU $5,798,000 by 8.3% in the Offering Documents; and

- Finance Costs were overstated by AU $1,452,000 or 15% in the Offering Documents.

87.     When BlueNRGY announced the 2012 and 2013 Financial Statements could no longer be relied upon, it shocked the market and caused the price of the Company's stock to plummet $0.76 per share or over 37% to close at $1.25 per share on October 24, 2014.

88.     On December 2, 2014, BlueNRGY filed a Form 6-K with the SEC announcing PwC's resignation as BlueNRGY's auditor which took effect on November 10, 2014. The 6-K states in relevant part:

**Resignation of Registered Independent Public Accounting Firm**

Effective November 10, 2014, PricewaterhouseCoopers ("PwC"), the registered independent public accounting firm for CBD Energy Limited (Administrators Appointed) (the "Company"), resigned from its role as auditor of the Company's financial statements in connection with the Company's US legal and regulatory requirements, having concluded that it is not independent of CBD under applicable PCAOB rules due to non-payment of its professional fees by the Company.

In its resignation letter, PwC noted that it did not presently have any disagreement with the Company on any matter of accounting principles or

practices, financial statement disclosure, or auditing scope or procedure, recognizing, however, that the Company continues to review certain accounting and governance issues (the "Investigation"), described both in the Company's October 24, 2014 Report of Foreign Private Issuer on Form 6-K (the "October 6-K") and in PwC's contemporaneous communications to the Company's Board of Directors (the "Board"). These communications expressed concerns about the adequacy of the Company's remedial response to, among other matters, necessary enhancements to internal controls, books and records, and governance. Specifically, in its resignation letter, PwC stated that "the adequacy of the Company's review of, and response to, these issues has not yet been resolved to our satisfaction and we are not in a position to predict whether the Company's remedial responses would have been resolved to our satisfaction." PwC also advised the Company that:

 –  had it not resigned before completion of its audit of the Company's financial statements for its 2014 fiscal year, it would have needed to significantly expand the scope of its audit; and
– the results from PwC's significantly expanded audit scope, together with results of the Investigation, may have prevented it from rendering an unqualified audit report and/or being able to rely on management's representations or be associated with the Company's financial statements

In light of PwC's resignation and the Company's disclosure in its October 6-K that its previously issued audited financial statements for the fiscal years 2012 and 2013 and its unaudited interim financial statements as of and for the six months ended December 31, 2013 should no longer be relied upon, the Company is evaluating alternatives for reissuing historical financial statements and finalizing its audit of financial statements for its 2014 fiscal year as soon as practicable. Notwithstanding the Company's intentions, there is no assurance that the Company will be able to bring its periodic financial statement reporting into compliance with the requirements of the U.S. Securities and Exchange Commission ("SEC") or with the listing rules of the Nasdaq Stock Market ("NASDAQ") and if it is not able to do so, the Company will not be able to maintain its standing as a Registrant under applicable SEC regulations. The resignation of the Company's auditors, the restatement of audited financial statements for the fiscal years 2012 and 2013, and the adjustments (if warranted) to the unaudited interim financial statements as of and for the six months ended December 31, 2013 are being considered by the Administrator (as defined below) as part of any potential restructuring process and importantly, the restatement process will only be progressed in circumstances where a viable restructuring proposal can be formulated.

On November 25, 2014, we furnished PwC with a copy of this portion of this Report of Foreign Private Issuer on Form 6-K (the

"Report"), providing PwC with the opportunity to inform the Company whether it agrees with the statements made by us herein with regards to PwC. On November 26, 2014, PwC informed the Company that it concurs with the statements made by us herein with regards to PwC

### *The Aftermath of the Truth and Subsequent Events*

89.     Beginning on October 24, 2014, McGowan took a 30-day leave of absence. On November 14, 2014, McGowan was suspended as Managing Director and removed as a director of the Company. McGowan resigned as a director of BlueNRGY effective December 30, 2014.

90.     On November 13, 2014, NASDAQ halted the trading of BlueNRGY common stock because of the Company's failure to lodge its 2014 Annual Report.

91.     On November 14, 2014, BlueNRGY filed for voluntary administration in Australia. The voluntary administration process is regulated by the Australian Corporations Act 2001 in which an administrator is appointed to provide for the business, property, and affairs of an insolvent company to maximize the company's chances of continuing existence or to reach results that would be more beneficial to the company's creditors rather than an immediate winding up of the company.  BlueNRGY exited voluntary administration on January 27, 2015.

92.     On November 25, 2014, the Company received a letter from NASDAQ's Listing Qualifications Department stating that, in light of the commencement of the voluntary administration, trading of the Company's common stock was to be suspended at the opening of business on Thursday, December 4, 2014 and that they would seek the delisting of the Company's shares. The Company appealed the delisting determination and appeared at a hearing before an independent NASDAQ Hearings Panel on January 8, 2015.

93.     On December 2, 2014, BlueNRGY filed a Form 6-K with the SEC announcing PwC's resignation as BlueNRGY's auditor which went into effect on November 10, 2014.

94. On January 26, 2015, BlueNRGY received a letter from the NASDAQ Hearings Panel granting BlueNRGY's request to continue to list on NASDAQ subject to it meeting a series of deadlines including filing the annual report on Form 20-F for the year ending June 30, 2014 by April 30, 2015. BlueNRGY failed to meet this deadline and as a result, the stock remained halted.

95. On March 19, 2015, the Company announced that after a vote at a shareholders meeting, the Company would be changing its name to BlueNRGY Group Limited. The name was officially changed to BlueNRGY Group Limited on March 20, 2015.

96. On June 1, 2015, BlueNRGY filed the 2014 20-F with the SEC. The 2014 20-F included the 2012 and 2013 Restated Financial Statements and details of the related party transactions as detailed above.

97. On July 10, 2015, BlueNRGY filed the 2014 20-F/A with the SEC.

98. On July 22, 2015, NASDAQ filed a Form 25 with the SEC to delist BlueNRGY common stock.

99. On September 19, 2015, BlueNRGY shares resumed trading on the OTC Markets under the ticker "CBDEF".

## CLASS ACTION ALLEGATIONS

100. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of common stock of BlueNRGY during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.  Also excluded from the Class are persons who have a net profit in purchases and sales of BlueNRGY's common

stock or otherwise suffered no compensable damages under the securities laws during the Class Period.

101.    The members of the Class are so numerous that joinder of all members is impracticable. Over 1.8 million shares were sold during the Offering, which were then actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BlueNRGY or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

102.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

103.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

104.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

105.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants as alleged herein;

(b)     whether statements made by Defendants or material facts omitted by Defendants misrepresented material facts about the business, operations, and management of BlueNRGY; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

106.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### *AFFILIATED UTE*

107.     Defendants' statements during the Class Period were misleading for omitting to disclose the related party transactions involving McGowan, which rendered statements in the Registration Statement misleading.

108.     Neither plaintiff nor the Class (defined herein) need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that BlueNRGY withheld be material in the sense that a

reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## <u>FRAUD ON THE MARKET</u>

109.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) BlueNRGY securities were traded in efficient markets during the Class Period.

110.    BlueNRGY securities traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on NASDAQ; (iii) BlueNRGY regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (viii) the price of BlueNRGY securities responded quickly to incorporate and reflect new public information concerning BlueNRGY during the Class Period.

## COUNT I
## Violations of Section 10(b) of the Exchange Act and Rule 10b-5
## <u>Against BlueNRGY</u>

111.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.    This Count is asserted against BlueNRGY and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

113.    During the Class Period, BlueNRGY engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of BlueNRGY common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BlueNRGY securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire BlueNRGY common stock at artificially inflated prices.

114.    Pursuant to the above plan, scheme, conspiracy and course of conduct, BlueNRGY participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases and other statements and documents described above that were designed to influence the market for BlueNRGY common stock. Such filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BlueNRGY's finances and business prospects.

115.    Information showing that BlueNRGY acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

116.    During the Class Period, BlueNRGY common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which BlueNRGY made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of BlueNRGY at prices artificially inflated by BlueNRGY's wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of BlueNRGY common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of BlueNRGY common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

117.    This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

**COUNT II**
**Violations of Section 20 of the Exchange Act**
<u>**Against the Individual Defendants**</u>

118.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.    This claim is asserted against the Individual Defendants, each of whom was a control person of BlueNRGY during the relevant time period.

120.    The Individual Defendants were control persons of BlueNRGY by virtue of, among other things, their positions as senior officers and directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Offering Documents.

121.    None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

31

122.    Because of their positions of control and authority as directors and senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which BlueNRGY disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause BlueNRGY to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of BlueNRGY within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BlueNRGY common stock.

123.    By reason of the misconduct alleged herein, for which BlueNRGY is primarily liable, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BlueNRGY.

124.    This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiffs and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff' counsel as Lead Counsel;

(b)    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts alleged herein;

(c)    Awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon; Awarding Plaintiff and the Class

their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)       Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 6, 2016                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

_____/s Keith R. Lorenze_____
Keith R. Lorenze. (State Bar No. 24046313)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: klorenze@rosenlegal.com

-and-

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (not admitted)
Laurence M. Rosen, Esq. (not admitted)
Yu Shi, Esq. (not admitted)
275 Madison Avenue, 34th Floor
New York, NY  10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: yshi@rosenlegal.com

Counsel for Plaintiff

33